E-FILED
Tuesday, 17 November, 2026 01:36:50 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

LAURA HOIS; ROBERT R. "RUSTY" STEVENS; JIMMY LEE TILLMAN II; JODIE ZITKO; MARY CATHERINE PAUKSTYS; GREGORY STENSTROM; HARRY R. HAURY; and UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS and JOHN OLDFIELD, each in his or her official capacity,

Defendants.

Case No. ____________________

EXHIBIT G — DECLARATION OF GREGORY STENSTROM

## EXHIBIT G — DECLARATION OF GREGORY STENSTROM

I, Gregory Stenstrom, declare as follows:

1. I am a Plaintiff in this action. I am familiar with Unite 4 Freedom, Inc.'s ("U4F") Illinois voter-registration and voter-history analyses, the machine-readable outputs generated from those analyses, and the files described below.

2. U4F generated the Scorecard CSV files by applying repeatable analytical tests and category rules to official Illinois voter-registration and voter-history data. The category names appearing in the first and second fields are U4F analytical classifications. They are not field names, findings, or admissions created or adopted by Illinois.

3. Each CSV row is a flagged condition instance. A registration identifier may appear in more than one row or category. The row totals therefore are not counts of distinct persons and do not, standing alone, establish that any registration or vote is unlawful. The files identify records for which the underlying State records are necessary to confirm, explain, reconcile, or correct the flagged condition.

4. The following file-level controls identify the preserved analytical outputs underlying the totals stated in U4F's August 18, 2026 notice and Appendix A (Exhibit A):

5. 2024_IL_NVRA_ScorecardSection01.csv — 950,368,591 bytes; 4,566,205 data rows; 3,875,145 unique identifiers; SHA-256 77632D842F40CA79CF8FC5591293FF568BA7CD1FB411E90B5C310B37E15EDD0C.

6. 2024_IL_NVRA_ScorecardSection02.csv — 310,989,906 bytes; 1,468,959 data rows; 1,045,659 unique identifiers; SHA-256 534999418B2EF4081A68E601D981522E3DB3AADC1CFC45E088F56DA1422223AD.

7. Both files are headerless; their first lines are data records. Section 01 has a recorded last-modified time of August 19, 2026 at 20:10:20.1628885 UTC. Section 02 has a recorded last-modified time of August 19, 2026 at 20:10:11 UTC.

8. I verified the Section 02 CSV after extraction from the supplied ZIP archive. It contains exactly 1,468,959 rows, each with 34 fields, and 1,045,659 distinct values in the registration-identifier field. Its first-category control totals, using the category labels exactly as they appear in the file, are: 01 Illegal Duplicate Registrations, 725,023; 02 Voted Before Registered, 317,697; 03 Inactive registration that was never active, 273; 04 Questionable inactive status, 28,352; 05 Voted while Inactive, 24,787; 06 Backdated Registrations, 35,557; 07 Modified Date Prior to Registration Date, 2,036; 08 Invalid or Illogical Registration Date, 142,846; 09 Age Discrepant Registrants, 6,071; 10 Registrants with questionable address, 126,304; 11 Registered after 2022 GE yet voted, 60,013. Total: 1,468,959.

9. The category labels quoted in the preceding paragraph are the screening labels U4F's analysis assigned when the files were generated. They are reproduced exactly because altering them would alter the files and their SHA-256 hashes. They are not findings. In particular, "Illegal Duplicate Registrations" identifies potential duplicate or conflicting registration records requiring comparison against Illinois's disposition records, not registrations determined to be illegal; and "Voted Before Registered" identifies records whose recorded registration date falls after a recorded vote, a condition Illinois attributes to differing local definitions of "registration date." See Exhibits A and D.

10. The Section 02 transport archive is named 2024_IL_NVRA_ScorecardSection02.zip. It is 80,923,828 bytes, has SHA-256 B28BCDC50E5BDD0F367E0DEB1D5D78A8DFF973BB962F1E4B014EEA7D47E6A311, and contains only the Section 02 CSV identified above.

11. The two uncompressed CSV files total 1,261,358,497 bytes. Their omission from the docket is based on file size, not on any unwillingness to produce them. The files are preserved and can be made available to the Court and the parties by secure electronic transfer, physical media, discovery production, or another method directed by the Court. The hashes above permit byte-for-byte verification of any produced copy.

12. I will compare the requested definitions, source transmissions, change histories, and dispositions against the preserved Illinois analyses, distinguish explained conditions from verified errors, and present supported issues to the responsible officials before certification. The file controls identify the preserved versions; an August 19 last-modified timestamp alone does not identify the bytes transmitted with the August 18 notice.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: 11/15/2026

Signed by:

Gregory Stenstrom

D2960023535049E...

Gregory Stenstrom

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LAURA HOIS,
ROBERT R. "RUSTY" STEVENS,
JIMMY LEE TILLMAN II,
JODIE ZITKO,
MARY CATHERINE PAUKSTYS,
GREGORY STENSTROM,
HARRY R. HAURY, and
UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS, in her official capacity as Executive Director and Chief State Election Official of the Illinois State Board of Elections, and JOHN OLDFIELD, in his official capacity as Director of Voting and Registration Systems,

Defendants.

**DECLARATION OF JODIE ZITKO**

I, Jodie Zitko, declare as follows:

1. My name is Jodie Zitko. I am an adult United States citizen residing at 3N778 Walt Whitman Rd., St. Charles, IL. 60175 in Kane County, Illinois. I am a registered Illinois voter in Illinois Congressional District 11 (IL-11). I voted in the November 5, 2024 federal general election and intend to vote in the November 3, 2026 federal general election.

2. Since March 2022, I have participated extensively in Illinois election-record review, voter-history analysis, election observation, election-judge training, statewide election-incident coordination, communications with election authorities, and the preservation of election-related records.

3. In February 2022, I learned through review of official Illinois voter-history data that my voter-participation record attributed participation to me in the 2010, 2014, and 2018 general elections even though I did not vote in those elections.

4. My husband, Kenneth Allen Zitko, likewise had participation entries attributed to him for those same three elections even though he also states that he did not vote in those elections.

5. The matching disputed entries in both of our records caused me to conclude that the issue could not responsibly be dismissed as a simple mistake in my memory or as an isolated personal-record anomaly.

6. I preserved and reviewed successive official State-derived voter-file snapshots dated August 28, 2021; June 14, 2022; October 13, 2023; October 15, 2024; January 24, 2025; and May 13, 2026.

7. Across those records, the disputed participation entries attributed to me can be identified and compared over time.

8. I have not received the originating applications, poll-book records, ballot-issuance records, voter-history source transactions, audit logs, correction records, user-activity records, reason codes, or written findings explaining how those entries were created, maintained, changed, or removed.

9. In 2023, my husband and I personally reported the disputed voter-history entries to the Kane County Clerk's office and sought an explanation.

10. I remain without a documented investigation, originating transaction, correction history, audit trail, or written determination explaining the entries.

11. Merely changing or removing a displayed participation entry would not resolve my concern. Without preservation of the source transaction and audit history, I cannot determine how the entry originated, whether the underlying records were corrected, whether similar conditions exist elsewhere, or whether the condition could recur.

12. After discovering participation attributed to my record for elections in which I did not vote, I changed the way I personally cast ballots because I wanted a more visible and documented chain surrounding the ballot issued in my name.

13. Beginning in the spring of 2023, my husband and I registered to receive vote-by-mail ballots. We receive those ballots but do not return them through the mail.

14. Instead, on Election Day, we personally bring each unvoted vote-by-mail ballot and its original envelope to our assigned precinct, inform the election judges that we wish to vote in person, surrender and spoil the vote-by-mail ballot, complete the required written process, and then receive and cast an in-person ballot.

15. We have used this procedure successfully in four election cycles since the spring of 2023 and plan to do so in November 2026.

16. This practice is important to me because it creates a contemporaneous and documentable sequence showing that a vote-by-mail ballot was issued in my name, remained in my possession, was not voted or returned through the mail, was surrendered and spoiled at

the precinct, and was replaced with an in-person ballot issued after check-in and completion of the required process.

17. That process should create records sufficient for later reconstruction and reconciliation, including the vote-by-mail issuance record, surrendered ballot and envelope, affidavit or other written documentation, poll-book or check-in record, in-person ballot-issuance record, and final voter-participation-history entry.

18. I should be able to determine from official records both how participation was attributed to me in elections in which I did not vote and whether elections in which I personally followed the surrender-and-spoil process were recorded accurately.

19. In addition to reviewing my own voter-history records, I sought direct experience with election administration. I attended Kane County election-judge training in September 2022 and later participated extensively in election observation and election-incident coordination.

20. During the November 2022 and spring 2023 election cycles, I coordinated or helped lead six election observation efforts across Illinois. In that role, I worked with poll watchers, election participants, volunteers, county contacts, and others to receive, evaluate, preserve, and escalate election-related incident reports.

21. The reporting process preserved time-stamped reports, county and precinct information, photographs where available, communications, spreadsheets, follow-up notes, and affidavits. My role included substantial responsibility for intake, coordination, follow-up, preservation, and escalation.

22. I also personally participated in poll watching and communications with county election officials and the Kane County State's Attorney's Office concerning election-administration issues that I personally observed or helped document.

23. During the April 4, 2023 Kane County Consolidated Election, our contemporaneous materials also documented election-night reporting figures that changed materially while additional precincts were being reported. At approximately 9:00 p.m., with 40 of 47 precincts reported, the public-facing figures reflected 11,427 ballots and 29,659 votes. By approximately 12:10 a.m., after 47 of 47 precincts were reported, the public-facing figures reflected 8,162 ballots and 20,929 votes.

24. I understood those changing figures to require explanation and reconciliation because the later reported totals were lower despite additional precincts having been reported. Our team preserved the screenshots, figures, calculations, and presentation materials so that the changes could later be reconstructed and reviewed.

25. I do not allege that those figures alone establish unlawful conduct or an incorrect election result. My concern is that material changes in official or public-facing election information should be capable of reconstruction and explanation through preserved underlying records.

26. These experiences have shown me that displayed voter-history records, analytical datasets, public reports, screenshots, summaries, and individual observations are not sufficient by themselves to determine what occurred within an official voter-registration or election record.

27. To responsibly investigate an identified condition, I need the underlying official definitions, voter-history source records, status and reason codes, transaction histories, dates of changes, notices, responsible custodians, audit histories, user-activity records, synchronization information, and documented dispositions.

28. Where a voter-history entry, registration record, ballot status, participation record, or other election record changes or differs across official records, I need sufficient information to determine what the prior record reflected, what changed, when and why it changed, what authority supported the change, and how the matter was ultimately resolved.

29. I have reviewed the requests for records and election-administration information identified in the Plaintiffs' August 2026 notice under the National Voter Registration Act. The records and information sought in that notice are directly relevant to my interests and activities as a registered Illinois voter and as a person who regularly reviews voter-registration and voter-history information, including my ability to investigate and evaluate conditions affecting my own voter record and other voter-registration records I review.

30. I intend to use responsive records to compare official voter-registration information, voter-history entries, transaction histories, status and reason codes, dispositions, audit information, and related official records with the election data and records already available to me; identify which conditions have documented explanations; present verified matters to responsible election officials; pursue lawful individualized correction or reconciliation where appropriate; and document their disposition.

31. I cannot responsibly perform those activities from analytical flags, voter-file snapshots, summary data, screenshots, public reports, or isolated records alone because those materials do not necessarily disclose the originating transaction, official explanation, correction history, change authority, audit trail, synchronization history, or final disposition necessary to determine whether an identified condition has been explained and reconciled.

32. The official information I need is not otherwise available to me through the records I already possess. Those records may identify a condition requiring investigation but do not substitute for the underlying official records necessary to determine what occurred.

33. My interest is not merely a generalized interest in election administration. It arises from my own disputed voter-history record, my personal efforts to obtain an explanation, the change I made to my own voting practices, my direct election-observation and records-

preservation activities, and my continuing need for official records sufficient to investigate and evaluate voter-registration and voter-history conditions.

34. I remain an Illinois voter and continue to participate in election-record analysis, election observation, organizational activity, and review of election administration.

35. I intend to continue receiving a vote-by-mail ballot and personally surrendering and spoiling it at my precinct before voting in person unless I am given a reliable and documented reason to change that practice.

36. I therefore expect to encounter the same voter-history, ballot-issuance, vote-by-mail surrender, ballot-spoilage, poll-book, affidavit, ballot-accounting, preservation, reconciliation, and related voter-registration systems in future federal elections.

37. Access to responsive records would allow me to compare official records with conditions I have personally encountered, determine whether identified conditions have documented explanations, seek lawful individualized correction or reconciliation where appropriate, and determine whether changes to my own voter-history record have been properly documented.

38. My need for those records does not end on Election Day. Official voter-registration, voter-history, participation, ballot-accounting, audit, and related records remain relevant during post-election review, reconciliation, canvass, preservation, and certification.

39. If material voter-registration, voter-history, participation, or related record conditions remain unresolved after voting, I intend to use preserved official records, where appropriate, to determine whether those conditions can be reconstructed, explained, corrected, and reconciled before final certification.

40. I am not asserting in this declaration that any presently identified voter-history discrepancy, changed record, reporting discrepancy, unavailable record, or other condition necessarily proves an unlawful registration, unlawful vote, or incorrect election outcome.

41. I am stating that material voter-registration and election-record conditions should be capable of investigation through preserved official records and, where appropriate, reconstruction and reconciliation.

42. The facts concerning my residence, voter registration, voting history, records review, voting practices, election-observation activities, election-incident coordination, communications with election officials, intended use of official records, and personal activities stated in this declaration are based upon my personal knowledge, except where I expressly identify information learned from official records, preserved datasets, written communications, or records created by other witnesses.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: October 20, 2026

At: Kane County, Illinois

[signature]

**Jodie Zitko**

**Sworn to and subscribed before me this** 20th **day of** October**, 2026.**

Cynthia A. Colar-DeJohnette

**Notary Public**

**My commission Expires:** 03/11/2027

CYNTHIA A COLAR-DEJOHNETTE
Official Seal
Notary Public - State of Illinois
My Commission Expires Mar 11, 2027

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LAURA HOIS,
ROBERT R. "RUSTY" STEVENS,
JIMMY LEE TILLMAN II,
JODIE ZITKO,
MARY CATHERINE PAUKSTYS,
GREGORY STENSTROM,
HARRY R. HAURY, and
UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS, in her official capacity as Executive Director and Chief State Election Official of the Illinois State Board of Elections, and JOHN OLDFIELD, in his official capacity as Director of Voting and Registration Systems,

Defendants.

**DECLARATION OF MARY CATHERINE PAUKSTYS**

I, Mary Catherine Paukstys, declare as follows:

1. My name is Mary Catherine Paukstys. I am an adult United States citizen residing at 5244 S. Newcastle Avenue, Chicago, IL 60638 in Cook County, Illinois. I am a registered Illinois voter in Illinois District 6 (IL- 06).. I voted in the November 5, 2024 federal general election and intend to vote in the November 3, 2026 federal general election.

2. I am a long-serving Chicago election judge who has served for more than three decades and continues to train and serve in current elections. My preserved Chicago Board of Election Commissioners records document repeated service as a Republican election judge beginning no later than 1994 and continuing through 2026.

3. My continuing service as both an Illinois voter and election judge places me directly within the voter-registration, voter-history, ballot-issuance, signature-verification, closing, chain-of-custody, reporting, reconciliation, preservation, and certification processes used in Illinois elections.

4. I preserved official Chicago Board assignment letters or credentials for multiple elections, including records dated September 6, 1994; March 19, 1996; February 26,

2019; April 2, 2019; March 17, 2020; November 3, 2020; November 5, 2024; and March 17, 2026.

5. Those records consistently identify me as a Republican election judge except for the November 3, 2020 general-election assignment, which identified me as a Democratic judge. I did not serve under that November 2020 assignment.

6. I did not request a change in party designation and had served as a Republican election judge for more than thirty-five years before the November 2020 assignment.

7. My official Illinois voter-participation data separately records a Democratic ballot in the March 17, 2020 primary, although I requested and cast a Republican ballot.

8. The matching Democratic designations appearing in my March 2020 voter history and November 2020 election-judge assignment remain unexplained by any correction record, source transaction, audit history, or written determination available to me.

9. In the summer of 2020, I contacted the Chicago Board of Election Commissioners to renew my election-judge application for the two-year term beginning with the November 3, 2020 general election. I requested to continue serving as a Republican judge at Ward 13, Precinct 1, where I had served for decades.

10. A Chicago Board representative told me that no Republican judge positions remained available at that location and offered an available Democratic judge position. I did not request a change in party designation, did not represent that I was a Democrat, and agreed to the offered position only because I wished to preserve my decades-long continuity of election-judge service at that polling place.

11. The resulting November 3, 2020 assignment credential identified me as a Democratic judge, although I ultimately withdrew and did not serve in that election.

12. The underlying assignment, party-designation, application-history, roster-change, source-record, and audit-history information is relevant to determining how and why my election-judge designation and voter-history records were recorded as they were.

13. I preserved election-judge training materials, quizzes, handbooks, written instructions, and precinct records. Those materials include differing instructions concerning the ballot to be issued when a registered voter's signature does not appear in the electronic poll book.

14. One set of preserved instructions directs issuance of a provisional ballot, while later 2026 Chicago training materials direct judges to issue a regular ballot without requesting identification.

15. I seek authoritative, preserved, and reconcilable procedures sufficient to determine which instruction governs and how voters and ballots handled under those circumstances are recorded and reviewed.

16. I have also observed recurring deficiencies or inconsistencies in election-judge training concerning closing procedures, signature verification, ballot issuance, and chain of custody.

17. In my experience, instructors have emphasized completing closing procedures quickly rather than carefully checking each assigned duty, and training has at times moved quickly over signature-verification responsibilities.

18. I have also observed instructors dictate answers to quiz questions rather than requiring election judges to independently demonstrate their understanding of governing procedures.

19. During 2026 election-judge training, a participant asked whether, when identification was required, a voter could satisfy that requirement by displaying an electronic image of identification on an iPhone. The instructor answered yes. I provide this statement to report the specific question and answer I personally heard.

20. During the same 2026 training, the instructor stated that it was false that two people were required to return election materials after the polls closed and said that one person could return the materials. That instruction differed from my prior understanding and training concerning bipartisan participation and the secure return and chain of custody of election materials.

21. In both returning-election-judge training classes I attended for the 2026 Primary Election and the 2026 Midterm Election, the Chicago Board of Elections instructor told attendees that initialing or signing across envelope flaps was not required.

22. That instruction conflicted with the written 2026 Chicago Board of Elections Election Judge/Election Coordinator handbook materials I reviewed. Pages 81 and 82 state that Envelope S for spoiled ballots, Envelope D for damaged ballots, Envelope W for write-in ballots and write-in tape, Envelope 71E containing specified results records, and Envelope 72E containing specified results records must be signed by judges across the sealed flaps.

23. I also reviewed 10 ILCS 5/24B-10, which contains a requirement that election judges sign across folds at which an envelope could be opened if unfastened. The purpose and practical effect of signing across the sealed flap, as I understand it from the written procedure, is to make later opening of the envelope observable through disturbance of the signatures. The difference between the oral training I personally received and the written requirements is important to me because these envelopes contain election materials relevant to ballot accounting, results, preservation, chain of custody, and later reconstruction.

24. I do not allege that any one training statement or instruction, standing alone, proves that votes were altered or that an election result was incorrect. My concern is that inaccurate, inconsistent, or conflicting instructions can produce different administration of voter-

identification, signature-verification, ballot-issuance, closing, transport, sealing, chain-of-custody, and record-preservation procedures.

25. During the November 5, 2024 federal general election, an assigned election coordinator told me at approximately 6:00 p.m. that coordinators had been trained to begin closing procedures before the statutory 7:00 p.m. closing time.

26. I objected while voters remained present. The coordinator contacted Chicago election headquarters, and a Board representative directed that no closing operations begin until 7:00 p.m. and until all voters had left.

27. During the March 17, 2026 primary, a different coordinator again asked me at approximately 6:00 p.m. to begin pre-initialing closing envelopes and paperwork while the polls remained open.

28. I preserved the 2026 Chicago election-judge handbook and the separately distributed "What's New" instructions stating that, when no known signature is available or the stored signature cannot be adequately examined, judges should accept the questioned signature and issue a regular ballot.

29. During the March 17, 2026 primary, I recorded materially different registered-voter totals for Ward 23, Precinct 2. A February 21, 2026 printed precinct register reflected 1,003 registered voters; three same-day registrations were processed; the electronic poll book displayed 1,071 registered voters at approximately 5:30 p.m. on Election Day; and the Chicago Board's public reporting reflected 996 registered voters the following day.

30. I do not allege that those numerical differences alone establish unlawful conduct. The available records do not identify the timing, source, reason, authority, or audit history necessary to reconcile the differing official counts.

31. These experiences have shown me that voter-history records, training materials, poll-book information, public reports, and individual observations alone do not always provide enough information to determine what occurred within the official election record.

32. To responsibly investigate and evaluate an identified condition, I need the underlying official definitions, voter-history source records, status or reason codes, transaction histories, notices, dates of changes, responsible custodians, audit histories, training records, synchronization information, and documented dispositions.

33. Where a voter-history entry, party designation, registered-voter total, ballot status, or other election record differs among official records or changes over time, I need sufficient information to determine what the prior record reflected, what changed, when and why it changed, what authority supported the change, and how the matter was ultimately resolved.

34. I have reviewed the requests for records and election-administration information identified in the Plaintiffs' August 2026 notice under the National Voter Registration Act.

The records and information sought in that notice are relevant to my interests and activities as a registered Illinois voter and a long-serving election judge, including my ability to review, investigate, and evaluate voter-registration and election-administration matters that I personally encounter.

35. I intend to use responsive records to compare official voter-registration information, voter-history entries, transaction histories, status codes, dispositions, audit information, and related records with the election records and materials already available to me; identify which conditions have documented explanations; present verified matters to responsible election officials; pursue lawful individualized correction or reconciliation where appropriate; and document their disposition.

36. I cannot responsibly perform those activities from isolated voter-history records, public reports, training materials, or summary information alone because those sources do not necessarily disclose the originating transaction, official explanation, correction history, change authority, audit trail, synchronization history, or final disposition necessary to determine whether an identified condition has been explained and reconciled.

37. The information I need is not otherwise available to me through the election-judge materials, precinct records, public reports, or isolated records I possess. Those materials may reveal a condition requiring investigation but do not substitute for the underlying official records necessary to determine what occurred.

38. My interest is not merely a generalized interest in election administration. It arises from my own voter-history record, my own election-judge assignments and training, the official records and instructions I have personally received, the discrepancies and conflicting instructions I have personally encountered, and my continuing participation in Illinois elections as both a voter and election judge.

39. I have served as a Chicago election judge during approximately forty-two of my forty-six years of adulthood. I began serving at approximately nineteen years of age and served in Ward 13 through the March 17, 2020 primary. After a temporary hiatus, I resumed service in Ward 23 for the November 5, 2024 federal general election and the March 17, 2026 federal primary.

40. Because I remain an active Illinois voter and election judge, I expect to encounter the same voter-history, party-designation, judge-assignment, training, signature-verification, ballot-issuance, sealing, chain-of-custody, closing, reporting, and reconciliation systems in future federal elections.

41. Access to responsive records would allow me to compare official records with conditions I have personally encountered, determine whether identified conditions have documented explanations, seek lawful correction or reconciliation where appropriate, and better understand the election procedures I am required to administer.

42. My need for those records does not end on Election Day. Official voter-registration and election records remain relevant during post-election review, reconciliation, canvass, preservation, and certification.

43. If material voter-registration, voter-history, ballot-issuance, signature-verification, closing, sealing, chain-of-custody, or related record conditions remain unresolved after voting, I intend to use preserved official records, where appropriate, to determine whether those conditions can be reconstructed, explained, corrected, and reconciled before final certification.

44. I am not asserting in this declaration that any presently identified voter-history discrepancy, differing voter total, training inconsistency, unavailable record, or other condition necessarily proves an unlawful vote, unlawful registration, or incorrect election outcome.

45. I am stating that material voter-registration and election-administration conditions should be capable of investigation through preserved official records and, where appropriate, reconstruction and reconciliation.

46. The facts concerning my residence, voter registration, voting history, election-judge service, assignment records, training, election procedures, precinct records, intended use of official records, and personal activities stated in this declaration are based upon my personal knowledge, except where I expressly identify information learned from records.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: October 21, 2026

At: Peoples Bank

Mary Catherine Paukstys

**Mary Catherine Paukstys**

**Sworn to and subscribed before me this 21 day of October, 2026.**

Vanessa Aguinaga

**Notary Public**

OFFICIAL SEAL
VANESSA AGUINAGA
NOTARY PUBLIC, STATE OF ILLINOIS
Commission No. 1035373
My Commission Expires July 17, 2030

**My commission Expires:** 7/17/2030

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LAURA HOIS,
ROBERT R. "RUSTY" STEVENS,
JIMMY LEE TILLMAN II,
JODIE ZITKO,
MARY CATHERINE PAUKSTYS,
GREGORY STENSTROM,
HARRY R. HAURY, and
UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS, in her official capacity as Executive Director and Chief State Election Official of the Illinois State Board of Elections, and JOHN OLDFIELD, in his official capacity as Director of Voting and Registration Systems,

Defendants.

**DECLARATION OF LAURA HOIS**

I, Laura Hois, declare as follows:

1. My name is Laura Hois. I am an adult United States citizen residing at 4405 Oakwood Ave. Downers Grove, IL. 60515, in DuPage County, Illinois. I am a registered Illinois voter in Illinois Congressional District 6 (IL-06). I voted in the November 5, 2024 federal general election and have voted early in the November 3, 2026 federal general election. I am also an elected Republican committeeperson in Downers Grove Township Precinct 007 and the Republican candidate for Illinois State Representative in District 81 in the November 3, 2026 general election. I previously ran for Illinois House District 81 in 2020 and for DuPage County Board District 2 in 2024.

2. I am presently campaigning for the November 3, 2026 election, raising and spending campaign resources, communicating with voters, organizing volunteers, reviewing election records, and preparing for an election in which my name will appear on the same ballot as federal contests.

3. My race will be administered through voter-registration, vote-by-mail, early-voting, polling-place, reporting, canvassing, reconciliation, preservation, and certification processes that are interconnected with the administration of federal elections in Illinois.

4. Because I am a current candidate whose election has not yet occurred, my interest in the records and election-administration practices described here is not limited to a past grievance. These matters presently affect my campaign, my preparation for the November 2026 election, and my ability to evaluate whether records affecting the election in which I am participating are preserved, complete, auditable, and capable of reconciliation.

5. During 2026, I personally sought and reviewed election records relating to voter registration, vote-by-mail administration, FPCA and UOCAVA records, ballot transmission and delivery, election-mail handling, chain of custody, election vendors, audit information, and related election-administration records in DuPage County.

6. I also authorized members of my campaign, including Lisa Forst, to obtain and review official DuPage County voter-registration, vote-by-mail, early-voting, FPCA, and UOCAVA records on behalf of my campaign.

7. On January 30, 2026, I submitted a written Freedom of Information Act request to the DuPage County Clerk Election Division concerning the retrieval, handling, transportation, security, and chain of custody of incoming election mail, including vote-by-mail ballots addressed to the Election Division's post-office box in Wheaton.

8. My request sought written policies, procedures, manuals, instructions, checklists, forms, labels, security logs, training materials, meeting materials, memoranda, emails, schedules, calendars, written notations, and logs identifying the frequency, personnel, and transportation methods used to retrieve and move election mail from the post-office box to the Election Division.

9. On February 6, 2026, the Election Division responded that it had no records responsive to those requests.

10. That response left me unable to determine from official records who retrieved election mail, when and how frequently it was retrieved, how it was transported, what security or bipartisan controls governed the transfer, how many ballots or pieces of election mail were moved, who received them, and what contemporaneous chain-of-custody documentation existed.

11. During the March 17, 2026 primary-election cycle, my campaign also reviewed official records concerning FPCA registrants and related ballot-administration records.

12. The Election Division identified 108 FPCA registrants whose disclosed forms, according to its July 28, 2026 response, lacked a completed "Mail To" or current mailing address in Section 3.

13. My campaign sought existing records showing how and where associated ballots were transmitted, delivered, returned, processed, accepted, rejected, and reconciled.

14. My campaign's original FPCA-related request was dated June 17, 2026. I personally followed up with the Election Division on June 24, 2026. After the Election Division treated the request as voluminous, I reviewed the response and participated in efforts to narrow the request while preserving the core records needed to trace the ballots.

15. On July 7, 2026, the request was narrowed to a sample of 45 registrants and five defined categories of existing records, including original FPCA and registration records; ballot mailing, delivery, USPS tracking, email-transmission and fax records; proof of delivery or return; rejection flags, audit entries, notes or comments; and existing reports or spreadsheets identifying requested and actual transmission methods and destinations.

16. On July 28, 2026, the Election Division produced redacted FPCA forms but stated that it had no records responsive to requests for ballot mailing and delivery logs, USPS tracking, email-transmission or fax records, proof of delivery or return, or notes, comments, rejection flags, and audit-trail entries associated with processing the forms.

17. I do not contend that an incomplete form, blank field, changed record, unavailable record, or analytical discrepancy by itself proves that a voter was ineligible, that a ballot was unlawfully issued or counted, or that an election result was incorrect.

18. My concern is that the available records were insufficient to trace and reconcile the complete chain from registration or application through ballot transmission, destination, delivery, return, acceptance or rejection, participation history, county reporting, synchronization into the statewide system, canvassing, and certification.

19. I have also reviewed records and communications concerning DuPage County's use of outside election vendors for ballot-printing and mailing services and have sought information sufficient to determine the governing scope, status, authorization, performance, and reconciliation of those services.

20. These experiences have shown me that analytical flags, isolated datasets, summary reports, and partial county records are not sufficient by themselves to determine what occurred in an individual voter-registration or election record.

21. To responsibly investigate and resolve an identified condition, I need the underlying official definitions, status codes, transaction histories, source records, dates of changes, notices, responsible custodians, audit histories, synchronization information, and documented dispositions.

22. Where a record changes, is removed, is added, reflects inconsistent participation information, or differs between local and statewide systems, I need sufficient official information to determine what the prior value was, what the subsequent value was, when and why the change occurred, what authority supported it, and whether the change was correctly reflected across the relevant election systems.

23. I have reviewed the requests for records and election-administration information identified in the Plaintiffs' August 2026 notice under the National Voter Registration Act.

The records and information sought in that notice are relevant to my interests and activities as a registered Illinois voter and as a current candidate appearing on the November 3, 2026 ballot, including my ability to review, investigate, and evaluate voter-registration and election-administration matters affecting the election in which I am participating.

24. I intend to use responsive records to compare official definitions, voter-registration dispositions, transaction histories, audit information, and other official records with the election data already available to me; identify which conditions have documented explanations; present verified matters to responsible election officials; pursue lawful individualized correction or reconciliation where appropriate; and document the disposition of those matters.

25. I cannot responsibly perform those activities from analytical flags or summary information alone because those materials do not necessarily disclose the official explanation, underlying transaction history, change authority, audit trail, synchronization history, notice, disposition, or other information necessary to determine whether an identified condition has been lawfully explained and reconciled.

26. The withheld or unavailable information is not otherwise available to me through public summary reports, campaign records, analytical datasets, or isolated county records. Those sources may reveal a condition requiring investigation but do not substitute for the official underlying records necessary to determine what actually occurred.

27. I have personally devoted time, and my campaign has devoted time and resources, to reviewing election records, preparing and narrowing records requests, communicating with election officials, consulting knowledgeable persons, and attempting to understand and reconstruct voter-registration and election-administration processes relevant to the election in which I am participating.

28. Those activities have required time and attention that otherwise could have been devoted to ordinary campaign activities, including voter contact, volunteer organization, fundraising, campaign communications, and policy development.

29. My interest is therefore not merely a generalized interest in election administration. It arises from my status as a registered Illinois voter, my intended participation in the November 3, 2026 federal election, my current candidacy, my personal records requests and review, and my continuing need for official records sufficient to investigate and evaluate voter-registration and election-administration matters affecting the election in which I am participating.

30. The relief sought in this action would have practical value to me before the November 3, 2026 election. Access to responsive records would allow me to personally review identified conditions, determine whether they have documented explanations, seek lawful correction or reconciliation where appropriate, and evaluate the administration of the election in which I am presently participating.

31. My need for those records does not end on Election Day. The official records will also remain important during reconciliation, canvass, preservation, and certification.

32. If material voter-registration or election-record conditions remain unresolved after voting, I intend to use the preserved underlying records to determine whether those conditions can be reconstructed, explained, corrected where appropriate, and reconciled before final certification.

33. Because my race appears on the same November 3, 2026 ballot as federal contests and depends upon interconnected voter-registration, participation-history, reporting, synchronization, reconciliation, canvassing, preservation, and certification processes, the availability and integrity of those records directly affects my ability to evaluate the administration of my own election.

34. I am not asserting in this declaration that any presently identified discrepancy necessarily changes an election outcome. I am stating that the official records necessary to investigate and reconcile material discrepancies should exist, be preserved, and be available for lawful review.

35. If unresolved record conditions persist through the election and into canvass or certification, my interest as a candidate will become even more immediate because I will need the preserved official records to evaluate whether the election record affecting my contest can be reconstructed and reconciled and whether material discrepancies have been resolved before certification.

36. The facts concerning my residence, voter registration, voting history, candidacy, records requests, communications, campaign activities, intended use of records, and personal activities stated in this declaration are based upon my personal knowledge, except where I expressly identify information learned from official records, written communications, or records obtained, or requests for records prepared by an authorized campaign representative.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: October 20, 2026

At: Downers Grove, Du Page County, Illinois

**Laura Hois** [signature]

State of IL

County of Dupage

This instrument was acknowledged before me on 10/20/2026 (date) by Laura Hois (name of person acknowledged)

[signature]

(Signature of Notary Public)

"OFFICIAL SEAL"
MIGUEL ANGEL ESPINOZA RAMIREZ
Notary Public, State Of Illinois
Commission No. 1030329
My Commission Expires April 22, 2030

(Seal)

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LAURA HOIS,
ROBERT R. "RUSTY" STEVENS,
JIMMY LEE TILLMAN II,
JODIE ZITKO,
MARY CATHERINE PAUKSTYS,
GREGORY STENSTROM,
HARRY R. HAURY, and
UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS, in her official capacity as Executive Director and Chief State Election Official of the Illinois State Board of Elections, and JOHN OLDFIELD, in his official capacity as Director of Voting and Registration Systems,

Defendants.

**DECLARATION OF ROBERT R. "RUSTY" STEVENS**

I, Robert R. "Rusty" Stevens, declare as follows:

1. My name is Robert R. "Rusty" Stevens. I am an adult United States citizen residing at 700 S. Monterey Villa Park, IL. 60181, in DuPage County, Illinois. I am a registered Illinois voter in Illinois Congressional District 6 (IL-06). I voted in the November 5, 2024 federal general election and intend to vote in the November 3, 2026 federal general election. I am presently a candidate for DuPage County Board District 2 in the November 3, 2026 general election.

2. I have previously participated in campaigns and election-observation activities. Because I am currently on the November 2026 ballot, the matters described in this declaration are current and affect an election in which I am personally participating.

3. My present race is administered through voter-registration, voter-address, vote-by-mail, signature-verification, cure, reporting, synchronization, canvassing, preservation, reconciliation, and certification processes interconnected with the administration of federal elections in Illinois.

4. During my 2022 and 2024 campaign activity, I used voter-address information made available for campaign purposes to send individualized first-class mail with address-correction service.

5. I selected address-correction service so that returned mail would contain postal information indicating whether an address was vacant, undeliverable, associated with a person who had moved, or otherwise could not be used to complete the campaign communication.

6. I preserved hundreds of returned pieces of campaign mail and their associated postal markings. My prior records reflect approximately 354 returned pieces, although the precise number should be verified from the preserved originals before I sign this declaration.

7. The returned pieces include markings reflecting conditions such as moved, vacant, no such number, unable to forward, unknown, and other delivery failures. I continue to possess, or have caused to be preserved, the original returned mail and related campaign records.

8. I do not contend that every returned mail piece identifies an ineligible voter, that every address discrepancy reflects an unlawful registration, or that every delivery failure affected a ballot.

9. My concern is that these preserved address and delivery conditions should be traceable to official registration-address records, address-change histories, vote-by-mail issuance and delivery records, undeliverable-ballot records, list-maintenance records, cure records, participation histories, and other records necessary to determine how the condition was addressed.

10. I have not received or identified a complete set of official records sufficient to determine whether the address conditions reflected in the returned campaign mail were identified, investigated, corrected, preserved, or reconciled within the official election records.

11. Removing an address from a private campaign list does not tell me what occurred in the official voter-registration record. To determine that, I need the official source, timing, reason, transaction history, notices, and disposition associated with relevant address changes.

12. Following the 2022 election, I also participated in vote-by-mail cure or verification activities for another candidate and personally traveled to, or participated in outreach to, addresses associated with voters whose vote-by-mail ballots required follow-up, verification, or cure.

13. During that work, I encountered circumstances in which the voter-address information and information obtained through follow-up did not permit me to determine from the records available to me how the corresponding registration, ballot, cure, and final ballot-status records were ultimately resolved.

14. I do not contend from those contacts alone that any voter was ineligible, any ballot was unlawful, or any ballot was improperly counted. Those experiences demonstrated why the official record should permit the registration address, ballot destination, delivery information, cure notice, voter response, signature-review decision, acceptance or rejection decision, participation history, and final ballot status to be reconstructed and reconciled where appropriate.

15. I have also personally observed DuPage County vote-by-mail signature-verification activity.

16. When I first observed the process, observers were positioned approximately twenty to thirty feet from personnel conducting signature review. At that distance, I could not meaningfully observe the signatures, comparison records, screen details, notes, flags, or reasons supporting individual decisions.

17. Observers were later permitted to move closer, to approximately five feet, which materially changed what could be seen.

18. I do not contend that every signature-verification decision was incorrect. My concern is that meaningful review requires adequate observation and preservation of records sufficient to determine how standards were applied.

19. Relevant records may include observer instructions, access information, signature-review standards, training materials, workflow records, acceptance and rejection codes, cure notices, reviewer identities, timestamps, audit entries, and final reconciliation records.

20. These experiences have shown me that returned mail, campaign records, isolated voter-file information, summary reports, and observations alone are insufficient to determine what occurred in an official voter-registration or election record.

21. To responsibly investigate an identified condition, I need the underlying official definitions, address-change histories, status codes, transaction histories, notices, source records, dates of changes, audit histories, responsible custodians, synchronization information, and documented dispositions.

22. Where an address changes, a voter record is updated, a ballot is returned as undeliverable, a cure process occurs, or related information differs among records or systems, I need sufficient official information to determine what changed, when and why it changed, what official action followed, and how the matter was ultimately resolved.

23. I have reviewed the requests for records and election-administration information identified in the Plaintiffs' August 2026 notice under the National Voter Registration Act. The records and information sought in that notice are relevant to my interests and activities as a registered Illinois voter and as a current candidate for DuPage County Board District 2 appearing on the November 3, 2026 ballot, including my ability to review, investigate, and evaluate voter-registration and election-administration matters affecting the election in which I am participating.

24. I intend to use responsive records to compare official voter-registration and address information, transaction histories, status codes, dispositions, audit information, and related records with the physical evidence and election information already available to me; identify which conditions have documented explanations; present verified matters to responsible election officials; pursue lawful individualized correction or reconciliation where appropriate; and document their disposition.

25. I cannot responsibly perform those activities from returned mail, analytical flags, summary data, isolated voter-file information, or campaign records alone because those materials do not necessarily disclose the official explanation, underlying transaction history, change authority, audit trail, notice, synchronization history, final disposition, or other information necessary to determine whether an identified condition has been explained and reconciled.

26. I have personally devoted time, and my campaigns have devoted time and resources, to reviewing returned mail, researching addresses, attempting voter follow-up, reviewing election records, participating in cure activities, observing signature-verification procedures, and attempting to understand and reconstruct voter-registration and election-administration processes.

27. Those activities required time and resources that otherwise could have been devoted to ordinary campaign activities, including voter contact, volunteer organization, fundraising, campaign communications, policy development, and other activities associated with my current campaign for DuPage County Board District 2.

28. My interest is therefore not merely a generalized interest in election administration. It arises from my status as a registered Illinois voter, my intended participation in the November 3, 2026 federal election, my current candidacy, the physical evidence I have preserved, the election processes I personally observed, the resources I have devoted to these matters, and my continuing need for official records sufficient to evaluate matters affecting the election in which I am participating.

29. Access to responsive records would allow me to compare official records with evidence and conditions I have personally encountered, determine whether identified conditions have documented explanations, seek lawful correction or reconciliation where appropriate, and evaluate the administration of the election in which I am presently participating.

30. My need for those records does not end on Election Day. They will remain relevant during post-election reconciliation, canvass, preservation, and certification.

31. If material voter-registration, address, vote-by-mail, cure, verification, or related record conditions remain unresolved after voting, I intend to use preserved official records to determine whether those conditions can be reconstructed, explained, corrected where appropriate, and reconciled before final certification.

32. My DuPage County Board District 2 race appears on the same November 3, 2026 general-election ballot as federal contests and is administered through election processes interconnected with the statewide voter-registration, reporting, reconciliation, canvassing, preservation, and certification framework.

33. I am not asserting that any presently identified address discrepancy, returned mail piece, cure condition, signature-review issue, or unavailable record necessarily proves an unlawful registration, unlawful ballot, or incorrect election outcome. I am stating that material conditions affecting voter-registration and related election records should be capable of investigation through preserved official records and, where appropriate, reconstruction and reconciliation.

34. If unresolved record conditions persist through the election and into canvass or certification, my interest as a candidate for DuPage County Board District 2 will become even more immediate because I will need those preserved records to evaluate whether conditions affecting my own contest have been documented and reconciled before certification.

35. The facts concerning my residence, voter registration, voting history, candidacy, campaign activities, preserved returned mail, voter-address follow-up, election observation, intended use of records, and personal activities stated in this declaration are based upon my personal knowledge, except where I expressly identify information learned from official records, postal records, campaign records, or written communications.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: 10-19-26

At: 700 S. monterey Villa Park IL 60181

**Robert R. "Rusty" Stevens**

Signature witnessed: October 19, 2026

Carolyn R. Carrillo

CAROLYN R. CARRILLO

OFFICIAL SEAL
CAROLYN R CARRILLO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 01/09/2027

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LAURA HOIS,
ROBERT R. "RUSTY" STEVENS,
JIMMY LEE TILLMAN II,
JODIE ZITKO,
MARY CATHERINE PAUKSTYS,
GREGORY STENSTROM,
HARRY R. HAURY, and
UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS, in her official capacity as Executive Director and Chief State Election Official of the Illinois State Board of Elections, and JOHN OLDFIELD, in his official capacity as Director of Voting and Registration Systems,

Defendants.

**DECLARATION OF JIMMY LEE TILLMAN II**

I, Jimmy Lee Tillman II, declare as follows:

1. My name is Jimmy Lee Tillman, II. I am an adult United States citizen residing at 7732 S. Calumet, Chicago, Illinois, 60619, in Cook County, Illinois. I am a registered Illinois voter in Illinois Congressional District 1 (IL-01). I voted in the November 5, 2024 federal general election and intend to vote in the November 3, 2026 federal general election.
2. I was a candidate for the United States Senate from Illinois during the 2022 and 2026 federal election cycles. In the March 17, 2026 Republican primary election, I was a candidate for the Republican nomination for the United States Senate but did not advance from the primary.
3. On July 29, 2026, I executed a signed written Statement of Intent, which was notarized, stating my intention to seek public office again in the future. My interest in Illinois election administration is therefore not limited to a completed campaign or past election.
4. As a former statewide federal candidate, a registered Illinois voter, and a person who has formally stated his intention to seek office again, I have a personal interest in the

preservation, accuracy, transparency, reconciliation, canvass, and certification of the election records and systems through which Illinois administers federal elections.

5. During the 2026 United States Senate primary, I experienced an unusual incident involving the public display of purported election results while early voting and campaigning were still underway.

6. On March 9, 2026, approximately eight days before the March 17 primary election, WGN-TV publicly broadcast an election-results ticker during its 4:00 p.m. news program displaying purported results for actual Illinois primary contests, including my pending Republican United States Senate race.

7. The display identified me and another candidate by name and showed specific vote totals and percentages. It displayed me at 49% with 432,330 votes and Don Tracy at 22% with 194,689 votes and represented that 100% of the vote was reporting.

8. Those figures were not actual certified or unofficial election returns. Election Day had not yet occurred, early voting and campaigning were still underway, and no lawful final result existed.

9. I later reviewed sworn affidavits filed by WGN representatives in the prior federal litigation stating that WGN characterized those figures as mock or test data used during technical testing of its Chyron ticker system. Those materials stated that the test display appeared live on air twice.

10. I do not contend that the Illinois State Board of Elections created, supplied, approved, or transmitted those figures. My concern is that purported results for my actual pending federal race were publicly displayed before Election Day and that the incident required preservation, review, clarification, and a documented response.

11. Shortly after the display appeared, voters, supporters, and other members of the public contacted me or persons associated with my campaign. Screenshots circulated, people asked whether the figures were real, and people expressed confusion about how vote totals could be shown before Election Day.

12. I personally received, reviewed, or was provided copies of social-media posts, emails, messages, screenshots, and related communications concerning the display. I preserved or caused those records to be preserved.

13. Those communications documented public exposure and confusion concerning purported election information relating specifically to my federal race.

14. The incident required me and persons assisting me to devote substantial time and resources to answering questions, correcting confusion, preserving evidence, preparing submissions, and pursuing administrative and judicial review.

**NOTICE OF VIOLATIONS OF THE NATIONAL VOTER REGISTRATION ACT**

**Pursuant to 52 U.S.C. § 20510(b)**

October 25, 2026

**Via Certified Mail, Return Receipt Requested, and Electronic Mail**

Bernadette M. Matthews
Executive Director and Chief State Election Official
Illinois State Board of Elections
2329 S. MacArthur Blvd.
Springfield, IL 62704

cc: The Honorable Kwame Raoul, Attorney General of Illinois, 500 South Second Street, Springfield, IL 62701
Marni M. Malowitz, General Counsel, Illinois State Board of Elections

Re: Notice of violations of 52 U.S.C. § 20507 concerning the documentation, uniformity, and verification of changes to registration and voter-participation records in the Illinois Voter Registration System

Dear Ms. Matthews:

# I. Purpose of This Notice

This letter gives written notice under 52 U.S.C. § 20510(b)(1) of continuing violations of the National Voter Registration Act (NVRA) in the process by which Illinois changes, documents, and verifies registration and maintains and edits voter-participation records in the Illinois Voter Registration System (IVRS).

This notice concerns process. It does not challenge the result of any election. It does not allege that any individual voter is ineligible, and it does not ask the State to remove any voter, to conduct any systematic removal during the period protected by 52 U.S.C. § 20507(c)(2)(A), or to change State process as to how any ballot is legally supposed to be cast or counted under current state and federal law.

Individual statutory inspection demand. Each undersigned person, individually and on that person's own behalf, hereby demands inspection under 52 U.S.C. § 20507(i) of the existing records identified in Annex B, including IVRS data dictionaries, change histories, transmission reports, work-item dispositions, cancellation reports, and confirmation-notice records. The Board shall promptly provide an inspection appointment or a rolling access schedule and identify, by category, the specific legal basis for any withholding.

This Notice itself constitutes each undersigned person's written request for inspection under § 20507(i), as well as notice of violations under § 20510(b). Annex A states the proposed testing protocol; Annex B specifies the requested records. The August 18 notice, its appendices, and previously served electronic evidence are expressly incorporated without withdrawal, waiver, or supersession. Any additional electronic materials, if served, shall be identified in a separate media manifest.

This notice identifies violations of the State's statutory duties under state and federal law and the corrective action requested to cure them.

## II. Persons Giving Notice

This notice is given by each of the following persons, each of whom is aggrieved by the violations described below:

- Unite 4 Freedom, Inc., through its authorized President, Harry R. Haury;
- Harry R. Haury;
- Gregory Stenstrom;
- Laura Hois, a registered voter in Illinois;
- Robert R. Stevens, a registered voter in Illinois;
- Jimmy Lee Tillman II, a registered voter in Illinois;
- Jodie Zitko, a registered voter in Illinois; and
- Mary Catherine Paukstys, a registered voter in Illinois.

Each person gives this notice individually and adopts every part of it.

## III. Background

On August 18, 2026, Unite 4 Freedom, Harry Haury, and Gregory Stenstrom served the Board with a notice and two machine-readable data files identifying registration and voter-participation records. The Board's response of September 14, 2026 stated that the files lacked headers, that one column could not be interpreted, and that duplicate entries lacked the matching record. The undersigned do not agree that the files were deficient as sent. In any event, those issues did not prevent the Board from identifying the requested categories of existing implementation records.

The undersigned preserve the earlier service. The State's September 14 response identifies interpretive questions concerning field headers, matching identifiers, and registration-date definitions. The undersigned request access to the existing State data dictionaries, source snapshots, field definitions, matching rules, and transaction histories necessary to resolve those questions. Supplementary files, if transmitted, will be identified by an authenticated manifest distinguishing the original transmitted materials from subsequent derivatives. The State is requested to identify any remaining interpretive difficulty with the previously served files. Any subsequently transmitted files, header keys, paired identifiers, and SHA-256 values will be separately documented in a media manifest specifying their provenance, version, creation date, and relationship to the files previously served.

The Board's September 14 letter and the accompanying high-level overview state that:

- local election authorities record whether each voter voted and transfer that information to IVRS, and the Board's data on voter participation "is provided to it by the election authority" (Sept. 14 letter at 6);
- local election authorities "do not report to SBE the reason for each determination" (id. at 7);
- corrections to records of who voted in a particular election are "not a common occurrence" (id. at 6–7 n.3);
- registration dates are recorded differently by the 108 election authorities, which may use the original registration date, the last voter-initiated date, or the date of the last change to the record (id. at 6 n.2);

- a registration is cancelled for change of address when the voter fails to respond to a confirmation notice and does not vote in two consecutive general federal elections (id. at 5); and
- the Board provides "oversight of unresolved work items" and "post-election data validation" (High-Level Overview at 2).

None of these statements shows that the Board examined, responded to, or cured the violations identified in the August 18 notice.

### Prior Notices and Requests Incorporated

This notice incorporates by reference, and does not withdraw or supersede, the following earlier communications:

1. **The August 18, 2026 Notice of Violations and Demand for Corrective Action**, with its Appendix A (Election Validity Scorecard), Appendix B (post-certification voter-history change analysis), and Electronic Exhibit 1 (machine-readable data), received by the Board on August 24, 2026. The record categories requested in Section V.B of that notice and Section IV of its Appendix B, including database transaction logs, change-history records, import, export, synchronization, and replication logs, system event logs, archival snapshots, exception, reconciliation, and quality-control reports, and automated workflow logs, remain outstanding to the extent they are held at the State level, and are restated in Annex B.
2. **The September 2, 2026 Notice of Evidence Preservation Obligations**, received by the Board on September 3, 2026. The preservation obligations it invoked remain in effect, and the undersigned specifically ask that every record identified in Annexes A and B be preserved in native form, including records that would otherwise be overwritten, rotated, or disposed of under a routine retention schedule.

The Board acknowledged both communications by email on September 4, 2026, and responded on September 14, 2026. The violations identified in the August 18 notice concerning the State's list-maintenance program under § 20507(a)(4) remain uncorrected and are restated, with additional facts, in Section IV.

## IV. Violations

### Violation 1. Failure to maintain records documenting changes to registration and voter-participation records (52 U.S.C. § 20507(i)(1))

**Duty.** Section 20507(i)(1) requires the State to maintain for at least two years, and to make available for public inspection, all records concerning the implementation of programs and activities conducted to ensure the accuracy and currency of official lists of eligible voters. Because a registrant's participation record determines whether the registrant may be removed under § 20507(d), changes to participation records are activities of that kind, and the records documenting them are records concerning their implementation.

Facts. Successive official statewide voter files show 254,027 changes to 2024 general-election participation records between the January 24, 2025 and May 13, 2026 files: 109,976 changes from "voted" to "did not vote," 15,119 changes from "did not vote" to "voted," 111,268 deletions, and 17,664 additions. Comparable changes appear for the 2022 and 2020 general elections. The Board states that local authorities do not report to it the reason for their determinations.

The response does not establish whether IVRS itself retains the source and basis of each change; that question requires inspection of existing logs and disposition records. The undersigned request Board-held and Board-controlled records and identification of the appropriate local custodians for records held exclusively by local election authorities, without conceding any disputed question about the State's statutory responsibilities. The comparison identifies changes to historical participation fields in files produced after certification. Those changes are not, by themselves, proof that ballots were altered or that certified contest totals changed. They require inspection of the existing transaction histories, source transmissions, prior and new field values, authorizations, and disposition records to determine when, how, and why the recorded participation history changed.

**Corrective action requested.** Record, for every change to a registration or participation record in IVRS, the source of the change (local transmission, identified automated process, or identified user), its date, its stated basis, and the supporting document; retain those records, together with IVRS audit trails and the Client Transmission, Site Activity, and Automatic Processing records, for at least the period § 20507(i) requires; and make them available for inspection subject to lawful redaction. If the State contends that it already maintains these records, it may demonstrate that by making them available for the registrations selected under the protocol described in Annex A.

## Violation 2. Non-uniform process for changing participation records after the canvass (52 U.S.C. § 20507(b)(1))

**Duty.** Every program and activity to protect the accuracy and currency of the voter list must be uniform and nondiscriminatory. 52 U.S.C. § 20507(b)(1).

Facts. The Board has not supplied a written statewide procedure that governs who may change a participation record after the canvass, on what proof, and with what documentation. Changes reach IVRS through 108 local systems and through State-level processes, each applying its own practice.

**Corrective action requested.** Adopt and publish a written, uniform statewide procedure governing changes to participation records after the canvass, specifying who may make them, the proof required, and the documentation to be recorded. This process should require review, edit authorities, authorization and complete before and after logs.

## Violation 3. Non-uniform registration-date data (52 U.S.C. § 20507(b)(1))

**Duty.** As stated under Violation 2.

**Facts.** The Board acknowledges that the 108 election authorities record "registration date" under different definitions. Registration dates are used to determine whether a registration was timely and which of two matching records is current. A field recorded under different definitions in different jurisdictions cannot support uniform list maintenance.

**Corrective action requested.** Adopt a uniform statewide definition of each registration-date field, require each election authority to report under it, and maintain a published mapping of the definitions currently in use. Ensure that the single required state database is fully synchronized with local ones after each election and before certification.

### Violation 4. Use of changed participation records in the removal process without safeguards (52 U.S.C. § 20507(b)(2) and (d))

**Duty.** A registrant may not be removed for failure to vote except as § 20507(c) and (d) allow. 52 U.S.C. § 20507(b)(2). Under § 20507(d), a registrant who fails to respond to a confirmation notice may be removed for change of residence only if the registrant also does not vote or appear to vote through the second following general election for federal office.

Facts. The Board confirms that Illinois cancels registrations under this two-election rule. A change from "voted" to "did not vote" can cause an eligible voter to appear not to have voted and lead to that voter's removal. A change from "did not vote" to "voted" can keep on the list a registration that should be removed under § 20507(a)(4). The Board has not supplied a procedure that identifies participation records changed after the canvass, verifies the basis for each change, or notifies the voter before a changed record counts toward removal.

**Corrective action requested.** Before any participation record changed after the canvass is used to support a cancellation under § 20507(d), verify the basis for the change and give the registrant notice and an opportunity to respond; restore accurate participation records for any registrant whose record the State cannot show was changed on a documented basis; and cancel no registration on the basis of such a record.

### Violation 5. Failure to conduct a reasonable program as to State-generated matches (52 U.S.C. § 20507(a)(4))

Duty. The State must conduct a general program that makes a reasonable effort to remove the names of ineligible voters by reason of death or change of residence. 52 U.S.C. § 20507(a)(4). Further, it is clear that the system assumes an entry of a registration in the first place is accurate. The number and nature of the analytical flags warrant inspection of how the State implements and documents its statutory death- and change-of-residence maintenance program.

Facts. The Board generates and distributes potential matches for deceased registrants, duplicate registrations, and change of address, and states that it oversees unresolved work items. The U4F Scorecard identifies analytical conditions requiring investigation, not adjudicated ineligible registrants. The State should make available the existing death- and change-of-residence matching records, work-item dispositions, and implementation procedures that permit those conditions to be tested against the statutory program.

Corrective action requested. Produce the existing implementation procedures, match criteria, work-item records, and disposition histories for death and change-of-residence programs. As a proposed corrective measure, conduct a statistically valid independent review of identified categories using databases the State may lawfully access. Establish and publish time limits for resolving State-generated matches, track each match to disposition, and report unresolved matches by jurisdiction and age.

### Violation 6. Failure to make list-maintenance records available for public inspection (52 U.S.C. § 20507(i)(1))

**Duty.** Section 20507(i)(1) requires the State to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." This duty is separate from the duty to maintain those records

described in Violation 1. It is violated when existing records are not made available, whether or not the underlying list-maintenance activity was lawful.

**Facts.** The August 18, 2026 notice, received by the Board on August 24, 2026, asked to inspect the record categories listed in its Section V.B and in Section IV of its Appendix B, including database transaction logs, change-history records, import, export, synchronization, and replication logs, system event logs, archival snapshots, exception, reconciliation, and quality-control reports, and automated workflow logs. The Board acknowledged that request on September 4, 2026 and responded on September 14, 2026, but has not made those records available for inspection. They remain outstanding and are restated in Annex B.

**Corrective action requested.** Make the records described in the August 18 notice and in Annex B available for inspection and copying, in native electronic form and subject to lawful redaction, on a schedule agreed during the cure period. For any category the Board contends it does not maintain, say so and identify the applicable retention schedule and disposition date. To the extent the August 18 notice gave notice of this violation, the period for correcting it runs from the Board's receipt of that notice on August 24, 2026.

## V. Verification Measures Requested

The violations above concern a process that does not document its own operation. Without records of where changes come from and on what basis, neither the State nor the public can determine whether the list is maintained accurately, uniformly, and without error to eligible voters. As part of the cure for Violations 1 through 5, the undersigned request that the State:

1. after each general election for federal office, prepare a reconciliation, by election jurisdiction, of voter-participation credit against ballots cast as shown in the canvass, explain any difference, and make the reconciliation available for inspection; and
2. after each general election for federal office, commission an independent, statistically valid random-sample audit of registration and participation records, conducted under a published, mutually acceptable protocol meeting the requirements of Annex A, with a sample size adequate to determine accurately the rates of undocumented changes, unsupported participation credit, registrations not maintained in accordance with § 20507, and registrations whose residential address or United States citizenship cannot be confirmed against federal and state databases, and publish aggregate results; any individual correction must follow the notice, verification, and removal protections prescribed by law.

## VI. Cure Period

The violations described in this notice are continuing. Under 52 U.S.C. § 20510(b),

**(2)** If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

**(3)**If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

Evidentiary clarification. The reported 56,164 difference compares certified turnout with participation-history entries in a later statewide file; it is not a finding of 56,164 unlawful votes. References to deletions and additions concern voter-history records, not physical ballots. The historically titled “Vote Tampering Report” is cited as a post-certification voter-history change analysis, without an inference of intentional alteration. The September 2 preservation letter is incorporated as historical notice of preservation demands; this Notice does not assert independent claims under other election statutes. Original exhibits remain unaltered. Any historical date, filename, or category-label discrepancy must be resolved through the source records and a signed technical declaration before being represented as corrected.

## VII. What This Notice Does Not Allege

The record-level files identify conditions requiring documentation. They are not counts of unlawful registrations or votes, and many identified conditions may have lawful explanations, such as corrections, merged duplicate registrations, cancellations, transfers, and reinstatements. The violations alleged here are that Illinois does not document, standardize, or verify the process by which those changes are made. This notice makes no allegation about the outcome of any election.

## VIII. Response and Contact

The undersigned request a written response stating, for each violation, whether the State disputes the duty, disputes the facts, or will take the corrective action requested, and on what schedule. The undersigned are available to confer at any time during the cure period. Please direct electronic correspondence and inspection scheduling to Harry R. Haury, coordinating requester, at harryhaury@protonmail.com. Written responses may also be sent to the return address shown on the certified-mail envelope.

Respectfully submitted,

Harry R. Haury, President and authorized representative
Unite 4 Freedom, Inc.
Signature: Signed by: [signature] C77A4429665E4DE...
Date: 10/25/2026

Harry R. Haury, individually
Signature: Signed by: [signature] C77A4429665E4DE...
Date: 10/25/2026

Gregory Stenstrom
Signature: Signed by: Gregory Stenstrom D2968023535049E...
Date: 10/26/2026

Laura Hois
Signature: DocuSigned by: Laura Hois 99DAA805478A425...
Date: 10/26/2026

Robert Stevens
Signature: DocuSigned by: Robert Stevens 47D1F8AE54F54EC...
Date: 10/26/2026

Jimmy Lee Tillman II
Signature: Signed by: Dr. Jimmy Lee Tillman II 7DC3DE7857C4422...
Date: 10/26/2026

Jodie Zitko
Signature: Signed by: Jodie Zitko E8FC0010CB534E7...
Date: 10/26/2026

Mary Catherine Paukstys
Signature: Signed by: Mary Catherine Paukstys A73E3203BEE342C...
Date: 10/25/2026

Enclosures and incorporated materials:

1. Previously served August 18, 2026 electronic evidence (incorporated by reference, not enclosed again). Any new electronic media will have a separately verified manifest specifying filenames, byte sizes, SHA-256 hashes, source/version relationships, and transmission dates.
2. Annex A, Testing Protocol
3. Annex B, State-Level Election Records Requested
4. August 18, 2026 notice, with Appendices A and B
5. September 2, 2026 preservation letter
6. Board's September 4, 2026 email and September 14, 2026 response and high-level overview

# Annex A. Testing Protocol

## A.1 Purpose

The purpose of testing is to measure the accuracy of the Illinois voter list. The NVRA exists to "ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4); the list it governs is the "official list[] of eligible voters," id. § 20507(i)(1); every State program to maintain "an accurate and current voter registration roll" must be uniform and nondiscriminatory, id. § 20507(b)(1); and the registration form the Act prescribes requires each applicant to attest to every eligibility requirement, "including citizenship," id. § 20508(b)(2). Under article III, section 1 of the Illinois Constitution and 10 ILCS 5/3-1, an eligible voter is a United States citizen who has resided in Illinois and in the election precinct for at least 30 days before the election. A list of eligible voters is accurate only to the extent that the persons on it meet those qualifications at the addresses recorded.

Testing will therefore establish a baseline: a measurement, with a known and adequate degree of accuracy, of how accurate or inaccurate the Illinois registration rolls are. It will determine the rate at which registrations on the 2024 roll, and the registrations of persons credited with voting in 2024, can be confirmed against federal and state databases as belonging to a living, identifiable person who is a United States citizen residing at a lawful residential address in the election jurisdiction. The baseline gives the State, the undersigned, and the public a common, objective starting point against which later corrective action can be measured. Testing also gives the State a defined means to show whether it maintains the records described in Violation 1 for the selected registrations, and ensures that the State and the undersigned examine the same records.

## A.2 A Mutually Acceptable Protocol

The undersigned propose that the State and the undersigned agree on a written testing protocol before any record is selected. The undersigned will confer with the State on its terms during the cure period and will consider in good faith any protocol the State proposes. The protocol should meet the following requirements:

1. **Two samples.** Two random samples are drawn. Sample 1 is drawn from every registration on the official statewide voter roll for the November 5, 2024 general election. Sample 2 is drawn from every registrant credited with voting in that election, including registrants whose registrations were later cancelled. Each population is identified by reference to a specific official file and its hash value.
2. **Random selection.** Registrations are selected at random from each population by a method that is fixed before selection and that either party can independently reproduce.
3. **Adequate sample size.** Each sample is large enough to determine, accurately and at a confidence level and margin of error agreed in advance, the rate at which each qualification tested cannot be confirmed.
4. **Identity and life status.** Each selected registration is checked to confirm that it belongs to a living, identifiable person, using Social Security Administration records through the Help America Vote Verification (HAVV) system (name, date of birth, and last four digits of the Social Security number); SSA death records, including the full death file available to State agencies; Secretary of State driver's license and identification-card records; and Illinois Department of Public Health death records and other databases that are available to the state.

5. **Address verification.** Each selected registration is checked to determine whether the registered address was a lawful residential address for the registrant in the election jurisdiction on the date of the election, using United States Postal Service data, including National Change of Address records and address-validation data identifying whether an address is a deliverable residential address; Secretary of State driver's license and identification-card records; property and assessment records; and reports received through the Electronic Registration Information Center to the extent they may lawfully be used.
6. **Citizenship verification.** Each selected registration is checked against federal and state records of citizenship or immigration status, including the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) program, with its queries based on Social Security numbers and its use of SSA citizenship data where available; SSA records; Secretary of State records of documents presented for a driver's license or identification card, including records of temporary visitor driver's licenses; and any notices from federal or state courts of persons excused from jury service for lack of citizenship.
7. **Other federal sources.** The protocol may include any other federal or state database that records identity, death, residence, or citizenship and that the State is lawfully permitted to use for voter-list accuracy. The databases used, and the reasons any proposed database was not used, are stated in the protocol.
8. Who runs the checks. Checks against databases whose use is limited by law to government agencies are run by the State, or by an agency or designee authorized to use them, under the governing terms of use. The query criteria, match rules, and results are disclosed to the undersigned. The undersigned propose an independent, appropriately qualified and bonded contractor selected through a mutually acceptable process, subject to lawful procurement, access, and privacy restrictions.
9. **Defined review.** The rules for classifying each selected registration are fixed in writing before any results are reviewed. For each qualification, a registration is classified as confirmed, not confirmed but explained by a documented lawful reason, or not confirmed and unresolved. The same sources and rules apply to both samples.
10. **Full transparency.** The protocol, selection method, selected registrations, databases and match rules used, classification rules, calculations, and results are available to both parties, and any departure from the protocol is documented and disclosed.

## A.3 Records for Selected Registrations

For each selected registration, the undersigned request the existing records within the Board's possession, custody, or control, including records held on its behalf by vendors or contractors, that show the registration's status history; the source, date, and basis of each change to the registration and its participation history; any work items, matches, or confirmation notices and their dispositions; and any verification of the registrant's identity, address, or citizenship previously performed. The undersigned additionally identify relevant records held by local election authorities. For records outside the Board's possession, custody, or control, they request identification of the local custodian and location, while reserving their position regarding statewide statutory responsibility. The undersigned do not request the creation of new records or explanations. Where a record does not exist, the undersigned ask only that the State say so.

## A.4 Results

Results will be reported for each sample, and separately for identity and life status, address, and citizenship, as the estimated rate at which each was confirmed, not confirmed but explained, and not confirmed and unresolved, each with its confidence interval. For each sample, the rate at which every qualification tested was confirmed, with its confidence interval, is the baseline measure of the accuracy of the rolls. A failure to confirm a qualification through a database is not a finding that any registrant is ineligible; database records can be incomplete or outdated. Results and calculations will be provided to the State before any public release, with an opportunity to identify registrations it contends were misclassified.

## A.5 Privacy and Use

- The undersigned accept redaction of Social Security numbers, driver's license numbers, protected addresses, and any other information whose disclosure federal law prohibits.
- Database checks will be performed only by persons lawfully authorized to use each database, and only in accordance with its terms of use and with applicable law, including the Driver's Privacy Protection Act.
- Records and results produced under the protocol will be used only to evaluate compliance with the NVRA and the State's maintenance of accurate voter lists.
- No individual voter's information will be publicly released. Published results will be in aggregate.
- Testing measures the accuracy of the list as a whole. It does not seek the cancellation of any registration or any action against any registrant, and no conclusion will be drawn about any individual registrant from it.

# Annex B. State-Level Election Records Requested

## B.1 Scope

This Annex lists every category of existing record held at the State level that bears on the matters in this notice, together with the local records described in category 2. It covers records within the possession, custody, or control of the State Board of Elections, including records held on its behalf by vendors or contractors and records the Board receives from other State agencies or from the Electronic Registration Information Center (ERIC). Except for the local records described in category 2, it does not request records held only by local election authorities, and it does not request ballots, ballot images, cast-vote records, or tabulation-equipment records.

**Period.** January 1, 2020 to the present, to the extent the records still exist, and in all cases the full two-year period for which 52 U.S.C. § 20507(i) requires records to be maintained.

**Legal basis.** Records concerning the implementation of programs and activities conducted to ensure the accuracy and currency of the voter list are requested under 52 U.S.C. § 20507(i). Records marked † concern election results and administration more generally; they are requested as public records under the Illinois Freedom of Information Act, 5 ILCS 140, and under § 20507(i) to the extent they concern list maintenance, including the posting and reconciliation of voter-participation records.

**Form.** Native electronic form where the records are kept electronically, with redaction of Social Security numbers, driver's license numbers, protected addresses, and other information whose disclosure federal law prohibits. Supervised inspection is acceptable where the Board contends that production is not feasible.

**Where a record does not exist.** The undersigned do not request the creation of new records. For any category the Board does not maintain, the undersigned ask only that the Board say so and identify any applicable retention schedule and disposition date.

## B.2 Categories

### 1. Statewide voter file and voter history

- Each statewide voter file, extract, or snapshot produced or retained since November 1, 2024, including files sold or provided to requesters, with the date each was generated.
- Daily Voter Snapshot reports for the same period.
- The data dictionary, file layouts, field definitions, status codes, reason codes, cancellation codes, and voter-history codes for the registration and voter-history data.
- Rules and specifications governing how participation credit is posted to IVRS, including timing and source.
- Any record of the definitions each election authority uses for registration-date fields, and any mapping of those definitions.

### 2. Change, transaction, and system records

- IVRS transaction, audit, and change-history logs for registration and voter-history records, showing for each change the field, prior and new values, date and time, and the user or process responsible.
- IVRS Client Transmission reports and batch summaries for every transmission from a local system.

- Import, export, synchronization, and replication logs for IVRS.
- Automatic Processing Report Details for every automated process that changes registration or participation records.
- Site Activity Reports for Board-level users.
- Records held by local election authorities, or transmitted by them to the Board, that document the source, date, and basis of each change identified in the previously noticed 2024 participation-record change analysis and any supplementary change file actually supplied. For records not held or controlled by the Board, the undersigned request identification of the responsible local election authority and record location; they reserve their position on the State's statutory responsibilities.
- IVRS exception, error, and quality-control reports.
- System event logs for IVRS bearing on changes to registration or participation records.
- An inventory of archival snapshots and backups of IVRS data, with their dates and retention periods, sufficient to show whether prior states of the data can be reconstructed.

**3. List-maintenance programs**

- Work Item Summary histories and dispositions for every category of work item, including potential duplicates, deceased registrants, incarcerated registrants, transfers and reinstatements, Social Security and driver's license verification, automatic address updates, interstate matches, invalid identifying information, and confirmation notices.
- Cancelled Voters reports.
- Outputs of the Board's daily duplicate-matching process and their dispositions.
- Death-matching files and results from Illinois Department of Public Health and Social Security Administration data.
- Incarceration-matching files and results from Illinois Department of Corrections data.
- Results of Social Security and driver's license verification through the Help America Vote Verification system and the Secretary of State.
- National Change of Address processing records and resulting address updates.
- ERIC records: dates and contents of data submissions, ERIC reports received that may be released under the ERIC agreement, ERIC compliance and utilization reports, and correspondence with ERIC concerning the release of reports.
- Records of registrations received through automatic voter registration and the online application system, including transfers from the Secretary of State and other agencies.
- Any statewide records of confirmation notices sent and responses received.

**4. Election administration and results†**

- County abstracts of votes and other canvass returns filed with the Board for the 2020, 2022, and 2024 general elections.
- The State canvass records and proclamations for those elections.
- Precinct-level and jurisdiction-level reports filed with the Board under 10 ILCS 5/22-15 and 22-15.1.
- Turnout and ballots-cast reports by jurisdiction and voting method, including early, mail, provisional, and election-day voting.
- Records of the Board's post-election data validation.
- Any reconciliation, at any level, of voter-participation records against ballots cast.

**5. Procedures, guidance, and oversight**

- Written procedures governing IVRS and list maintenance, including every version of the IVRS manual in effect since January 1, 2020.
- Guidance, directives, memoranda, and training materials issued to election authorities on posting and correcting voter history, list maintenance, duplicate resolution, and registration dates.
- Records of the Board's oversight of unresolved work items, including reports by jurisdiction and age.
- Records of the Board's monitoring of ERIC compliance.

**6. Federal and statutory reporting†**

- Illinois's submissions to the Election Administration and Voting Survey for 2020, 2022, and 2024.
- Reports concerning NVRA compliance and the State's list-maintenance program.
- Correspondence with the U.S. Department of Justice concerning voter-list maintenance or voter-registration records.

**7. System administration and retention**

- Policies identifying which roles at the State level can create, change, or delete registration or voter-history records, and the approval required. The undersigned do not request passwords, security configurations, or other information whose disclosure would compromise system security.
- Contracts and statements of work with any vendor that develops, hosts, or maintains IVRS.
- Reports of any incident affecting the integrity of registration or voter-history records.
- The retention schedules that apply to each category in this Annex.

**8. Records responsive to the prior notices**

- Every record within the categories requested in Section V.B of the August 18, 2026 notice and Section IV of its Appendix B, to the extent held at the State level and not already listed above.

# EXHIBIT N - RECORD AND SOURCE INVENTORY

Historical notices and State records

Exhibits A–F contain the August notice and Illinois analyses, acknowledgments and correspondence, preservation demand, September response and overview, IVRS manual, and ERIC materials. The original exhibit labels and Bates references are retained.

Witness declarations

Exhibits G–L and O contain the executed declarations of Gregory Stenstrom, Jodie Zitko, Mary Catherine Paukstys, Laura Hois, Robert R. Stevens, Jimmy Lee Tillman II, and Harry R. Haury. The testimony, visible signatures, and actual execution dates are reproduced from the supplied executed copies.

Second notice

Exhibit M contains the fourteen-page second NVRA notice, including Annexes A and B and the original signatories.

Machine-readable source records

Exhibit G identifies the preserved analytical CSV files, transport archive, byte sizes, and SHA-256 controls. Those native files are not attached to the complaint because of their size. Their identification and proposed production arrangements are stated in the declaration.

Evidence summary

Exhibit P organizes the existing official-file comparisons, personal record disputes, requests, and requested reconciliation by reference to Exhibits A–O. It is an exhibit summary rather than additional witness testimony.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

LAURA HOIS; ROBERT R. "RUSTY" STEVENS; JIMMY LEE TILLMAN II; JODIE ZITKO; MARY CATHERINE PAUKSTYS; GREGORY STENSTROM; HARRY R. HAURY; and UNITE 4 FREEDOM, INC.,

Plaintiffs,

v.

BERNADETTE MATTHEWS and JOHN OLDFIELD, each in his or her official capacity,

Defendants.

Case No. ____________________

EXHIBIT O — DECLARATION OF HARRY R. HAURY

## EXHIBIT O — DECLARATION OF HARRY R. HAURY

I, Harry R. Haury, declare as follows:

1. I am a Plaintiff, a Missouri resident, and Chair and President of Unite 4 Freedom, Inc. ("U4F"). I am authorized to speak for its Illinois records-inspection project. U4F analyzes official voter files, requests implementation records, publishes findings, and presents supported issues for lawful correction.

2. I signed the August 18, 2026 Illinois NVRA communication for U4F and myself. U4F, Gregory Stenstrom, and I are requesters identified in that communication. It identifies the Illinois analyses, alleged failures, requested records, and corrective action. Exhibit A reproduces the supplied communication and materials.

3. The Board received the August notice August 24. Its September 4 email acknowledged both that notice and the September preservation demand and stated that the twenty-day cure period for the August notice expired September 14. Exhibit B contains the acknowledgment communications; Exhibit C contains the preservation demand.

4. The September 14 response provided general materials and promised another letter on the § 20507(i) request. As of November 4, 2026 I have received no promised supplement, inspection appointment for the remaining categories, custodian index, or completion schedule. Exhibit D is the supplied response and overview.

5. I joined the Second Notice dated October 25 and transmitted October 26, 2026. As of November 4 I have received no response making the remaining requested implementation records available. Actual transmission and receipt dates are established by the underlying communications and service records, not by this declaration's date alone.

6. U4F's Illinois analysis and inspection work preceded this lawsuit. We need definitions, source/change histories, matching work items, notices, responses, synchronization information, and dispositions to test the existing analyses, separate explained conditions from verified errors, and submit supported jurisdiction-specific issues. Stenstrom will assist the comparisons; I will direct inspection and evaluate the resulting dispositions.

7. General descriptions and purchasable voter-file snapshots do not provide those operational records. Continued nonproduction prevents completion of the specified work during the open canvass. I request prompt preservation, inspection, and independent examination before certification under the proposed protocol.

8. I describe my own acts, receipt of communications, and intended work from personal knowledge and the organization's records. I have reviewed the historical communications identified above. The numerical and file-control statements in Exhibit G require Stenstrom's own confirmation; this declaration does not independently verify missing native files.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: 11/15/2026

Signed by:

C77A4429665E4DE...

Harry R. Haury

# EXHIBIT P CONTINUING CONDITIONS AND REQUESTED RECONCILIATION

Evidence roadmap prepared from Exhibits A–O. This exhibit organizes existing evidence; it is not an additional witness declaration or a completed audit. References below use the exhibit's own internal pages or section, avoiding shifting combined-PDF pagination.

## Official-file comparison through 2026

Exs. A and M, Violation 1: January 24, 2025 to May 13, 2026; 254,027 changes to 2024 participation fields, including 109,976 voted-to-not-voted, 15,119 reverse changes, 111,268 deletions, and 17,664 additions.

Requested reconciliation: Trace the selected identifiers across versions, source transmissions, prior/new values, authority, and disposition; determine current status and whether the change was explained. Historical field changes are not themselves changes to certified totals.

## Personal histories still disputed

Exs. H–I: Zitko disputes 2010/2014/2018 participation; Paukstys disputes the March 2020 party-ballot entry. Their renewed requests and intended inspection continue in 2026.

Requested reconciliation: Obtain the source event, correction history, relevant local/state transmission, and written disposition. Identify what persists in the latest available version and whether it affects present maintenance.

## 2026 requests connected to a current candidate

Ex. J: January 30 election-mail request; February 6 no-record response; later FPCA request narrowed to forty-five registrants and five categories; July 28 production with missing operational categories reported.

Requested reconciliation: Trace existing State-controlled and properly obtained local transmission, receipt, processing, and disposition records. Relate findings to the candidate's stated examination work; identify the responsible local custodian where needed.

## Address conditions requiring lawful follow-through

Exs. A, K: analytical address flags and approximately 354 preserved pieces of returned campaign mail.

Requested reconciliation: Match source identifiers securely; examine address history, notice, response, disposition, and current status. Returned campaign mail alone is not a determination of ineligibility.

**State-held means of reconciliation**

Ex. D, response at 6 n.2 and 7–8 and overview at 1–2; Ex. E, named IVRS reports and work-item histories. Different local registration-date meanings and State synchronization/matching functions are described.

Requested reconciliation: Produce existing definitions, mappings, Client Transmission, Site Activity, Automatic Processing, cancellation, snapshot, and work-item records within possession, custody, or control; state actual coverage and gaps.

**Notice and continuing nonproduction**

Exs. A–D, M, O: August notice, August 24 receipt, September preservation acknowledgment, September 14 response and promised supplement, October renewed notice, and declared nonproduction as of November 4.

Requested reconciliation: Order a named compliance official, rolling inspection, sworn category accounting, fixed deadlines, and recurring status reports. Missing documents require a specific search/gap explanation, not an assumed admission of misconduct.